IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

TAB BONIDY, *et al.*,
Plaintiffs-Appellees,

v.

UNITED STATES POSTAL SERVICE, *et al.*,
Defendants-Appellants.

On Appeal from the United States District Court for the District of Colorado
No. 10-cv-02408-RPM, The Honorable Richard P. Matsch

**APPELLEES' PRINCIPAL AND RESPONSE BRIEF**
(Oral Argument is Requested)

James M. Manley
Steven J. Lechner
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
jmanley@mountainstateslegal.com
lechner@mountainstateslegal.com

Attorneys for Plaintiffs-Appellees

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned attorney for Plaintiff-Appellee, National Association for Gun Rights ("NAGR"), certifies that NAGR is a non-profit corporation that has no parent corporation and has never issued any stock.

Respectfully submitted this 2nd day of January 2014.

> /s/ James M. Manley
> James M. Manley
> Steven J. Lechner
> MOUNTAIN STATES LEGAL FOUNDATION
> 2596 South Lewis Way
> Lakewood, Colorado 80227
> (303) 292-2021
> jmanley@mountainstateslegal.com
> lechner@mountainstateslegal.com
>
> Attorneys for Plaintiffs-Appellees

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................... ii

TABLE OF AUTHORITIES .................................................. v

STATEMENT OF PRIOR OR RELATED APPEALS......................... 1

JURISDICTIONAL STATEMENT ......................................... 2

STATEMENT OF THE ISSUES ........................................... 3

STATEMENT OF THE CASE ............................................. 4

STATEMENT OF FACTS ................................................. 6

SUMMARY OF ARGUMENT .............................................. 8

ARGUMENT.............................................................. 9

I.      STANDARD OF REVIEW........................................... 9

II.     THE SECOND AMENDMENT APPLIES OUTSIDE THE
        HOME ....................................................... 10

        A.      *Heller* And *McDonald* Recognize That The Text Of
                The Second Amendment Protects The Right To Carry ..... 10

        B.      State Courts Have Long Protected The Right To Carry .... 15

        C.      Numerous Federal Courts Have Recognized The
                Right To Carry ....................................... 23

III.    UNDER STRICT OR INTERMEDIATE SCRUTINY, THE
        USPS FAILED TO MEET ITS EVIDENTIARY BURDEN....... 30

        A.      Heightened Scrutiny Applies To Both The Parking
                Lot And Lobby Firearms Ban ........................... 31

1.    The lobby of the Avon Post Office is not a
sensitive place ............................................................... 32

2.    Presumptively lawful regulations can still be
unconstitutional ........................................................... 37

B.    Strict Scrutiny Is Appropriate, Because The USPS
Ban Places A Severe Burden On The Core Second
Amendment Right Of Armed Self-Defense ....................... 39

C.    Under Either Strict Or Intermediate Scrutiny, The
USPS Failed To Draw A Connection Between Crime
Prevention And Its Firearms Ban ....................................... 42

CONCLUSION ........................................................................... 51

STATEMENT REGARDING ORAL ARGUMENT ............................ 51

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abilene Retail No. 30, Inc. v. Bd of Com'rs of Dickinson County*,
   492 F.3d 1164 (10th Cir. 2007) ........................................... 36

*Adderley v. Florida*,
   385 U.S. 39 (1966) ............................................ 29

*Andrews v. State,*
   50 Tenn. 165 (1871) ........................................ 16

*Barker v. Wingo*,
   407 U.S. 514 (1972) ........................................ 13

*Bateman v. Perdue*,
   881 F. Supp. 2d 709 (E.D.N.C. 2012) ............................... 26, 27

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989) ........................................ 30, 43

*In re Brickey*,
   70 P. 609 (Idaho 1902) ..................................... 17, 18, 35

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ........................................ 36

*City of Los Angeles v. Alameda Books*,
   535 U.S. 425 (2002) ........................................ 36

*City of Las Vegas v. Moberg*,
   485 P.2d 737 (N.M. Ct. App. 1971) ................................ 17, 18, 35

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
   704 S.E.2d 365 (Va. 2011) ..................................... 32, 33

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................ *passim*

*Drake v. Filko*,
    724 F.3d 426 (3d Cir. 2013) ................................................ 16, 25

*English v. State*,
    35 Tex. 473 (1871) ....................................................... 20, 21, 22

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ......................................... 9, 30, 40, 42

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ............................................................ 43

*GeorgiaCarry.Org, Inc. v. Georgia*,
    764 F. Supp. 2d 1306 (M.D. Ga. 2011) ................................... 25, 30

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) .............................................. 25

*Gwinn v. Awmiller*,
    354 F.3d 1211 (10th Cir. 2004) ............................................... 9

*Hall v. Garcia*,
    2011 WL 995933 (N.D. Cal. Mar. 17, 2011) .............................. 32, 33

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ................................... 14, 30, 45, 47

*Hill v. State*,
    53 Ga. 472 (1874) ......................................................... 19, 21

*Hudson v. Michigan*,
    547 U.S. 586 (2006) ............................................................ 13

*Hustler Magazine v. Falwell*,
    485 U.S. 46 (1988) ............................................................. 49

*Initiative and Referendum Institute v. U.S. Postal Service*,
    417 F.3d 1299 (D.C. Cir. 2005) ....................................... 13, 40, 49

*Johnson v. Tompkins*,
    13 F. Cas. 840 (CC Pa. 1833) ............................................................ 10

*Kachalsky v. Cnty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ...............................................20, 25, 28, 41

*Kellogg v. City of Gary*,
    562 N.E.2d 685 (Ind. 1990) ............................................................. 17

*Lakewood v. Pillow*,
    501 P.2d 744 (Colo. 1972) ........................................................... 17, 35

*Lynch v. State*,
    6 S.W. 190 (Tex. Ct. App. 1887) ..................................................... 22

*Masters v. State*,
    685 S.W.2d 654 (Tex. Crim. App. 1985) ......................................... 22

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010) ........................................................... *passim*

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ......................................................................... 13

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ................................................. *passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
    *Ins. Co.*, 463 U.S. 29 (1983) ............................................................. 36

*Muscarello v. United States*,
    524 U.S. 125 (1998) ......................................................................... 11

*Nunn v. State,*
    1 Ga. 243 (1846) ........................................................................ 16, 18

*People v. Aguilar*,
    2013 WL 5080118 (Ill. 2013) ........................................................... 17

*People v. Nakamura*,
  62 P.2d 246 (Colo. 1936) ..................................................... 17

*People v. Zerillo*,
  189 N.W. 927 (Mich. 1922) ................................................. 17

*Peruta v. San Diego*,
  758 F. Supp. 2d 1106 (S.D. Cal. 2010) ............................... 25

*Peterson v. Martinez*,
  707 F.3d 1197 (10th Cir. 2013) ......................................... *passim*

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ............................................................ 41

*Rockville Reminder v. U.S. Postal Service*,
  480 F.2d 4 (2d Cir. 1973) .................................................. 50

*Simmons v. Sykes Enters., Inc.*,
  647 F.3d 943 (10th Cir. 2011) ............................................. 9

*State v. Blocker*,
  630 P.2d 824 (Or. 1981) ..................................................... 35

*State v. Reid,*
  1 Ala. 612 (1840) ........................................................... 16, 19

*State ex rel. City of Princeton v. Buckner*,
  377 S.E.2d 139 (W.Va. 1988) ............................................ 17

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ............................................................ 47

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ...........................30, 37, 38, 40

*United States v. Chovan*,
  735 F.3d 1127 (9th Cir. 2013) ........................................ *passim*

*United States v. Davis,*
304 Fed. Appx. 473 (9th Cir. 2008) ................................................. 33-34

*United States v. Decastro,*
682 F.3d 160 (2d Cir.2012) ............................................................. 38

*United States v. Dorosan,*
350 Fed. Appx. 874 (5th Cir. 2009) ................................................. 29

*United States v. Leon*,
468 U.S. 897 (1984) ......................................................................... 13

*United States v. Masciandaro,*
638 F.3d 458 (4th Cir. 2011) ........................................................... *passim*

*United States v. Miller,*
307 U.S. 174 (1939) ......................................................................... 20

*United States v. Reese,*
627 F.3d 792 (10th Cir. 2010) ......................................................... *passim*

*United States v. Skoien,*
614 F.3d 638, 643 (7th Cir. 2010) ................................................... 9, 30, 47

*United States v. Williams*,
616 F.3d 685 (7th Cir. 2010) ........................................................... *passim*

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ......................................................................... 30, 43, 39

*Warden v. Nickels,*
697 F. Supp. 2d 1221 (W.D. Wash. 2010) ...................................... 33

*Woollard v. Gallagher,*
712 F.3d 865 (4th Cir. 2013) ........................................................... 25, 47

## **Constitutional Provisions**

U.S. Const. amend. II............................................................................. *passim*

## Statutes

C.R.S. § 18-9-112 ...................................................................... 34

C.R.S. § 18-12-201 *et seq* ...................................................... 7

C.R.S. § 18-12-203 .................................................................. 7, 23

Credit Card Act of 2009,
§ 512, 16 U.S.C. § 1a-7b (2009)........................................ 27

18 U.S.C. § 922(g) .................................................................. 42, 44

18 U.S.C. § 922(g)(1) ............................................................. 37

18 U.S.C. § 930....................................................................... 44

18 U.S.C. § 930(d)(3) ............................................................ 44

28 U.S.C. § 1291..................................................................... 2

28 U.S.C. § 1331..................................................................... 2

39 U.S.C. § 409(a)................................................................... 2

## Regulations

36 C.F.R. § 2.4(b) ................................................................... 27, 38

39 C.F.R. § 232.1(*l*) ............................................................... 4, 36

## Rules

5th Cir. R. 47.5.4 ................................................................... 29

10th Cir. R. 28.2(c)(1) ........................................................... 1

Fed. R. App. P. 4(a)(3) .......................................................... 2

## Other Authorities

Denver Rev. Mun. Code § 38–117 ..........................................................     23

Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L.
& PUB. POL'Y 17(1995) ........................................................................     21

David Kopel, *Pretend "Gun-free" School Zones: A Deadly Legal
Fiction*, 42 CONN. L. REV. 515 (2009)...............................................     48, 49

Eugene Volokh, *Implementing the Right to Keep and Bear Arms
for Self-Defense: An Analytical Framework and a Research
Agenda*, 56 UCLA L. REV. 1443 (2009)...............................................     19, 48

Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The
Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L.
& CRIMINOLOGY 150 (1995).....................................................................     48

James Bishop, Note, *Hidden or on the Hip: The Right(s) to Carry
After* Heller, 97 CORNELL L. REV. 907 (2012)........................................     19, 23

James R. Norvell, *Oran M. Roberts and the Semicolon Court*, 37
TEX. L. REV. 279 (1959) ..........................................................................     21-22

Philip J. Cook, et al., *Gun Control After Heller: Threats and
Sideshows From a Social Welfare Perspective*, 56 UCLA L. REV.
1041 (2009)..............................................................................................     48

Robert H. Churchill, *Gun Regulation, the Police Power, and the
Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139
(2007)......................................................................................................     35

## STATEMENT OF PRIOR OR RELATED APPEALS

This is a cross-appeal. Appellants' (collectively "the USPS")[1] appeal is

docketed as No. 13-1374. Undersigned counsel is unaware of any other prior or

related appeals within the meaning of 10th Cir. R. 28.2(c)(1).

---

[1] Appellants are the United States Postal Service; Patrick Donahoe, Postmaster
General; and Michael Kervin, Acting Postmaster, Avon, Colorado.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over Mr. Bonidy's and NAGR's (collectively "Bonidy") claims pursuant to 39 U.S.C. § 409(a), because this action was brought against the United States Postal Service. Jurisdiction was also proper pursuant to 28 U.S.C. § 1331, because the claims arise under the United States Constitution. On July 9, 2013, the district court entered a final order resolving cross-motions for summary judgment and disposing of all Bonidy's claims. Docket No. 44, Mem. Op. and Order at 11 (Aplt. App. at A925). The USPS appealed on September 6, 2013. Docket No. 48, Defs.' Notice of Appeal (Aplt. App. at A927). Bonidy timely filed a cross-appeal on September 18, 2013. Docket No. 51, Notice of Appeal (Aplt. App. at A929); Fed. R. App. P. 4(a)(3). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the USPS's total prohibition on both open and concealed carrying of a firearm for self-defense in the lobby of the Avon Post Office violates the Second Amendment. Docket No. 33, Pls.' Cross-Mot. for Summ. J. and Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Cross-Mot.") at 1 (Aplt. App. at A614).

Whether the USPS's total prohibition on possessing a firearm for self-defense in a private vehicle parked in the public Avon Post Office parking lot violates the Second Amendment.[2]

---

[2] Contrary to the USPS's characterization, this case has nothing to do with explosives. *See* Br. for Appellants at 2.

# STATEMENT OF THE CASE

In 1972, the USPS banned all firearms from postal property:

> Weapons and explosives. Notwithstanding the provisions of any other law, rule or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes.

39 C.F.R. § 232.1(*l*).  Bonidy filed the instant action seeking declaratory and injunctive relief to remedy the USPS's deprivation of Bonidy's right to keep and bear arms.  Bonidy brought two claims for relief:  (1) the USPS violates the Second Amendment by prohibiting Bonidy from possessing a firearm in a private vehicle parked in the public postal parking lot adjacent to the Avon Post Office; and (2) the USPS violates the Second Amendment by prohibiting Bonidy from carrying a firearm (open or concealed) in the lobby of the Avon Post Office while picking up his mail.

After full discovery, the parties filed cross-motions for summary judgment.  Mem. Op. and Order at 2 (Aplt. App. at A916).  The district court struck down the USPS firearms ban as applied to Bonidy's use of Avon Post Office parking lot, but upheld the ban as applied to carry in the Post Office lobby.  Mem. Op. and Order at 11 (Aplt. App. at A925).

The district court concluded, consistent with most federal courts that have answered the question, that the Second Amendment protects the right to carry. *Id*.

at 5 (Aplt. App. at A919). The district court also made numerous factual findings about the Avon Post Office, recounted in detail below. Applying intermediate scrutiny to the parking lot firearms ban, the district court held that the USPS's "broad, conclusory statements" were insufficient to demonstrate that a total ban on constitutionally protected activity is substantially related to the government's interest in crime prevention. *Id*. at 8 (Aplt. App. at A922). Because the parking lot ban "ignores . . . the core concern of the Second Amendment," the district court correctly struck it down "as applied to Bonidy and his request to use the parking lot with his gun securely stored in his car . . . ." *Id*. at 10–11 (Aplt. App. at A924–25).

With respect to the firearms ban in the Post Office lobby, the district court concluded that the lobby ban is "presumptively lawful," because the lobby is a "sensitive place," and shifted the burden to Bonidy to prove the unconstitutionality of the ban. *Id*. at 5 (Aplt. App. at A919). The district court concluded that this Court's decision in *Peterson v. Martinez*, 707 F.3d 1197, 1211 (10th Cir. 2013), limited Bonidy to asserting a right to carry a firearm *openly* in the Post Office lobby. Mem. Op. and Order at 4–5 (Aplt. App. at A918–19). This led the district court to assume that "the presence of an individual openly carrying a firearm may excite passions, or excited passions may lead to the use of the firearm. Someone could also attempt to take the firearm from its lawful carrier and use it for criminal purposes." *Id*. at 10 (Aplt. App. at A924). Given the district court's narrow

reading of *Peterson*, it did not consider whether the concerns that purportedly justified the lobby ban would be addressed by allowing concealed carry instead.

## STATEMENT OF FACTS

This case is about the Avon Post Office and its adjacent parking lot. The Post Office is a freestanding building, with both a public parking lot and a restricted-access employee parking lot. *Id*. at 2 (Aplt. App. at A916). Because the Post Office does not offer home delivery, it provides free post office boxes in the lobby, which is open to the public at all times. *Id*. The mail service counter opens and closes on a regular schedule, and the public is not permitted behind the counter or in the mail sorting area. *Id*.

No security or law enforcement officers are regularly employed at the Post Office to protect the personal security of postal patrons. *Id*. at 3 (Aplt. App. at A917); Pls.' Cross-Mot. ¶¶ 12–19 (Aplt. App. at A619–20). Nor do security personnel screen persons entering the Post Office to determine whether persons are carrying firearms, or weapons of any kind. Pls.' Cross-Mot. ¶ 12 (Aplt. App. at A619). Security personnel do not restrict access to the Post Office to only those persons who have been screened and determined to be unarmed. *Id*. ¶ 13 (Aplt. App. at A619). No packages are screened to determine if they contain weapons. *Id*. ¶ 18 (Aplt. App. at A620). The public is free to come and go as they please, 24 hours a day, seven days a week, in the lobby area of the Post Office. *Id*. ¶ 10 (Aplt.

App. at A619).  The public parking lot adjacent to the Post Office is similarly

unsecured and open to the public.  *Id.* ¶¶ 8, 21 (Aplt. App. at A619–20).

Bonidy lives in rural Colorado and, because he does not have home mail

service, must pick up his mail at the Avon Post Office.  Mem. Op. and Order at 3

(Aplt. App. at A917).  Bonidy regularly carries a handgun for self-defense, which

he is licensed to do pursuant to Colorado's Concealed Carry Act.  C.R.S. § 18-12-

201 *et seq*.  Before issuing Bonidy his concealed carry permit, and every five years

thereafter, the Eagle County Sheriff runs a fingerprint-based background check to

determine that Bonidy is over 21 years old, has no history of substance abuse or a

criminal record, is not subject to a protection order, and has demonstrated

competency with a handgun.  C.R.S. § 18-12-203; Pls.' Cross-Mot. ¶¶ 26–27

(Aplt. App. at A621).  Because of the USPS firearms ban, Bonidy has an architect

employed by his firm pick up his mail.[3]  Mem. Op. and Order at 3 (Aplt. App. at

A917).

---

[3] The USPS confuses the facts when it argues that Bonidy has an administrative
assistant pick up his mail.  Br. for Appellants at 33–34.  That was the case "three or
four years ago," Bonidy Dep. at 50 (Aplt. App. at A690); i.e., prior to 2009, when
Bonidy was first licensed to carry a firearm for self-defense.  Bonidy Dep. at 87
(Aplt. App. at A692).  The only reason he currently pays an architect to pick up his
mail is because of the USPS firearms ban.  Mem. Op. and Order at 3 (Aplt. App. at
A917); Bonidy Dep. at 150–52 (Aplt. App. at A697).

## SUMMARY OF ARGUMENT

The text, history, and tradition of the Second Amendment demonstrate that it protects the right to carry a firearm for self-defense outside the home. Accordingly, the USPS firearms ban implicates the core right of personal safety protected by the Second Amendment. It is therefore subject to heightened scrutiny, i.e., either strict or intermediate scrutiny. The district court concluded correctly that the Second Amendment protects the right to carry, and that a ban on all firearms stored in a private vehicle parked in the Avon Post Office parking lot is unconstitutional.

The district court erred, however, in concluding that the lobby of the Avon Post Office is a "sensitive place," and erred further by therefore placing the burden on Bonidy to prove the unconstitutionality of the lobby firearms ban. The Post Office lobby is not a sensitive place. Moreover, even if the lobby were a sensitive place, the burden should have remained on the USPS to justify the carry ban—as applied to both open and concealed carry—under heightened constitutional scrutiny. Under strict or intermediate scrutiny, the USPS failed to draw a sufficient connection between an important government interest and its firearms ban. Accordingly, both the parking lot firearms ban and the lobby firearms ban at the Avon Post Office should have been struck down.

# ARGUMENT

## I.   STANDARD OF REVIEW.

This Court reviews the district court's grant of summary judgment de novo. *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011).  Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004).

In *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010), this Court adopted a "two-pronged approach" to Second Amendment claims.  The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *Id.* at 800.  If the law imposes such a burden, as the USPS ban does in this case, then this Court "must evaluate the law under some form of means-end scrutiny."  *Id.* at 801.  In no case has this Court applied less than intermediate scrutiny to a Second Amendment claim.  *Id.*  Strict scrutiny would be appropriate here, because in no prior case has this Court assessed a total ban on firearms carried by law-abiding individuals for self-defense.  *See Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("All this suggests that a more rigorous showing than that applied in *Skoien* should be required, if not quite 'strict scrutiny.'").

## II.    THE SECOND AMENDMENT APPLIES OUTSIDE THE HOME.

The USPS's central argument is that the Second Amendment has no application outside the home, and thus no application to the public property at issue in this case.  Br. for Appellants at 13–27.  The text, history, and tradition of the Second Amendment—and the other Bill of Rights guarantees—foreclose this argument.

### A.    *Heller* And *McDonald* Recognize That The Text Of The Second Amendment Protects The Right To Carry.

The USPS's objection to the right to carry begins by arguing that *District of Columbia v. Heller*, 554 U.S. 570 (2008), did not hold gun bans outside the home unconstitutional, so that case is irrelevant.  Br. for Appellants at 13.  But this myopic reading of *Heller* ignores the sweeping historical analysis that underpins the Court's decision in that case, which included numerous observations that it was long accepted that "a citizen has 'a right to carry arms in defence [sic] of his property or person, and to use them, if either were assailed with such force, numbers or violence as made it necessary for the protection or safety of either.'" 554 U.S. at 611 (quoting *Johnson v. Tompkins*, 13 F. Cas. 840, 850, 852 (CC Pa. 1833)).

The district court wisely rejected the USPS's narrow reading of *Heller*. Mem. Op. and Order at 5 (Aplt. App. at A919) ("[T]he Court concludes that the Second Amendment protects the right to openly carry firearms outside the home

for a lawful purpose, subject to such restrictions as may be reasonably related to public safety.").  In fact, the Supreme Court itself has described *Heller* as holding "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense . . . ."  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010).  In *Heller*, the Court struck down a law that "banned the possession of handguns in the home," and its holding is therefore tailored to that conclusion; but the Court in no way limited the Second Amendment to the home.  *See* 554 U.S. at 635 ("But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field, any more than *Reynolds v. United States*, our first in-depth Free Exercise Clause case, left that area in a state of utter certainty." (citation omitted)).  The Court's detailed historical analysis of the Second Amendment necessarily defined the phrase "bear arms," as protecting a right to carry firearms in public  *Id*. at 584–86.  The Court concluded in no uncertain terms that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'"  *Id*. at 584.  The Court applied this common historical understanding of the term "bear" to conclude that the Second Amendment protects the "individual right to possess and carry weapons in case of confrontation."  *Id*. at 592.  The Court adopted Justice Ginsburg's definition of the phrase "to bear arms," from *Muscarello v. United States*, 524 U.S. 125, 143 (1998):

> Surely a most familiar meaning is, as the Constitution's Second
> Amendment . . . indicate[s]:  "wear, bear, or carry . . . upon the person

11

or in the clothing or in a pocket, for the purpose . . . of being armed
and ready for offensive or defensive action in a case of conflict with
another person."

*Heller*, 554 U.S. at 584 (internal citations omitted) (omissions in original).  The

Court made clear that the right to "possess and carry weapons in case of

confrontation" is at the core of the Second Amendment.  *Id.* at 592.  It also

observed that, "most [Americans] undoubtedly thought [the right to keep and bear

arms] . . . important for self-defense and hunting."  *Id.* at 599.  Both self-defense

and hunting occur outside the home, including on public property.  *See United*

*States v. Masciandaro*, 638 F.3d 458, 466 (4th Cir. 2011).

In *McDonald*, the Court confirmed that the right protected by the Second

Amendment is "fundamental to *our* scheme of ordered liberty."  130 S. Ct. at 3050

(emphasis in original).  Therefore, the Second Amendment does not protect "a

second-class right, subject to an entirely different body of rules than the other Bill

of Rights guarantees."  *Id.* at 3045.

The Court was cognizant that its interpretation of the Second Amendment as

protecting the "individual right to possess and carry weapons in case of

confrontation," *Heller*, 554 U.S. at 592, came with potential public safety

implications.  As the Supreme Court noted in *McDonald*, every right enshrined in

the Constitution "has controversial public safety implications":

All of the constitutional provisions that impose restrictions on law
enforcement and on the prosecution of crimes fall into the same

category. *See, e.g., Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States v. Leon*, 468 U.S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker v. Wingo*, 407 U.S. 514, 522 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda v. Arizona*, 384 U.S. 436, 517 (1966) (Harlan, J., dissenting); *id.*, at 542 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases . . . will return a killer, a rapist or other criminal to the streets . . . to repeat his crime").

*McDonald*, 130 S. Ct. at 3045 (parallel citations omitted). But public safety implications have not prevented courts from insisting on other Bill of Rights guarantees, including as applied to the sort of public property at issue in this case. *See Initiative and Referendum Institute v. U.S. Postal Service*, 417 F.3d 1299, 1306 (D.C. Cir. 2005) (holding unconstitutional USPS ban on the solicitation of signatures on postal property because it was not narrowly tailored.). The right to keep and bear arms is no different. *McDonald*, 130 S. Ct. at 3045.

The USPS makes a sweeping argument based on narrow dicta in *Heller* that identifies certain "longstanding" firearms regulations as "presumptively lawful," including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."[4] 554 U.S. at 626; 627 n.26. The USPS relies on *Heller*'s "presumptively lawful" dicta to exclude the Second Amendment from

---

[4] The USPS argues for the first time on appeal that the USPS ban is "longstanding." Br. for Appellants at 12. First promulgated in 1972, the USPS ban is one of the most recently enacted regulations to face judicial scrutiny since *Heller*. *See United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013).

all government property, Br. for Appellants at 13, but its expansive interpretation is ahistorical and *Heller* itself warns against reading too much into such dicta:

> It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued.

554 U.S. at 625 n.25. The Court did not hold that "presumptively lawful" regulations are necessarily constitutional in all applications, nor did it elaborate about the contours of these categories. Rather, the Court left the task of clarifying various applications of the Second Amendment to future cases, such as this one.[5] *See Chovan*, 735 F.3d at 1134–39 (rejecting a broad interpretation of the "presumptively lawful" dicta); *Masciandaro*, 638 F.3d at 475 ("It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation."); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("[W]e need not speculate on the limits that Illinois may in the interest of public safety constitutionally impose on the carrying of guns in public; it is enough that the limits it has imposed go too far."). As the district court recognized,

---

[5] As demonstrated below, *infra* Part III.A.1., the public property at issue in this case does not fit into any plausible reading of the "presumptively lawful"/"sensitive places" dicta. Even if it did, this would not relive the government of meeting its heavy burden of proof in this case. *See Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (Plaintiff may overcome the *Heller* dicta presumption "by showing the regulation does have more than a de minimis effect upon his right. A requirement of newer vintage is not, however, presumed to be valid.").

"constitutional freedoms do not end at the government property line." Mem. Op. and Order at 6 (Aplt. App. at A920).

This does not mean that the right to carry is unlimited. Nor do Bonidy's claims depend on an "unlimited right to keep and bear arms." Br. for Appellants at 16. But the government's authority to regulate is tempered by the Constitution and must be measured against the constitutional text, history, and tradition. *Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."). As demonstrated herein, the USPS firearms ban is an unconstitutional abrogation of the right to carry, with no substantial relationship to the USPS's stated goal of crime prevention.

**B.    State Courts Have Long Protected The Right To Carry.**

Contrary to the distorted view of history offered by the USPS and its amicus, there is a long and sustained tradition of carrying firearms for self-defense in the United States:

> As befits a diverse nation of fifty sovereign States and countless municipalities, gun regulation in the United States resembles a patchwork quilt that largely reflects local custom. . . . . Thirty-one States currently allow open carry of a handgun without a permit, twelve States . . . allow open carry with a permit, and seven States prohibit open carry entirely. By contrast, four States and parts of Montana allow concealed carry without a permit and forty-four States allow concealed carry with a permit. One State, Illinois, prohibited public carry of handguns altogether, but that law was struck down as violative of the Second Amendment . . . .

*Drake v. Filko*, 724 F.3d 426, 440–41 (3d Cir. 2013) (Hardiman, J., dissenting) (footnotes omitted). This modern regulatory mosaic—with all 50 States protecting the right to carry to varying degrees—reflects the historical record.

*Heller* points to a number of 19th-century state court decisions regarding carry bans to illustrate laws that "have come close to the severe restriction of the District's handgun ban" and "have been struck down":

> In *Nunn v. State,* [1 Ga. 243, 251 (1846)] the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). In *Andrews v. State,* [50 Tenn. 165, 187 (1871)] the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns. *See also State v. Reid,* 1 Ala. 612, 616–617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, [sic] would be clearly unconstitutional").

554 U.S. at 629. These cases are of particular importance because "the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right" that can only be understood in light of the "historical background." *Heller*, 554 U.S. at 592. The Court has indicated its approval of the longstanding principle that bans on carrying firearms outside the home, or regulations that amount to bans, violate the right to keep and bear arms. As the Court's discussion above suggests, this proposition has long been accepted by state courts. *See, e.g., People v.*

*Aguilar*, 2013 WL 5080118 (Ill. 2013) ("[I]f *Heller* means what it says, and 'individual self-defense' is indeed 'the central component' of the second amendment right to keep and bear arms . . . then it would make little sense to restrict that right to the home . . . ."); *Kellogg v. City of Gary*, 562 N.E.2d 685, 694 (Ind. 1990); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 144 (W.Va. 1988); *Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972); *City of Las Vegas v. Moberg*, 485 P.2d 737, 738 (N.M. Ct. App. 1971); *People v. Nakamura*, 62 P.2d 246, 247 (Colo. 1936); *People v. Zerillo*, 189 N.W. 927, 928 (Mich. 1922); *In re Brickey*, 70 P. 609, 609 (Idaho 1902).

The facts of *City of Las Vegas v. Moberg*, 485 P.2d 737 (N.M. Ct. App. 1971), are instructive. There, the "defendant went to the booking room of the city police department of the city of Las Vegas to report the theft of certain items from his automobile. At the time, defendant was carrying a pistol in a holster." 485 P.2d. at 738. As a result, he was convicted of violating a municipal ordinance that prohibited the carrying of deadly weapons. *Id*. The New Mexico Court of Appeals reversed the conviction. *Id*. at 739. The court drew a distinction between bans on concealed carry, which "do not deprive citizens of the right to bear arms; their effect is only to regulate the right," and a ban on both open and concealed carry. *Id*. at 738. The court held that a total ban, "den[ies] the people the constitutionally guaranteed right to bear arms, and to that extent the ordinance under consideration

is void." *Id*. Thus, the court explicitly concluded that the right to bear arms extends to government buildings.

Likewise, the Idaho Supreme Court long ago foreclosed carry bans, even on public property. *In re Brickey*, 70 P. 609 (Idaho 1902). That case presented a situation similar to *Moberg*, in that the statute at issue banned both open and concealed carry. *Id*. The court held that both the State and Federal constitutions prohibited a total ban on carrying firearms:

> Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it.

*Id.* Accordingly, the conviction under review was overturned and the statute struck down. *Id*.

The historical record is clear that the right to carry may not be rendered nugatory, as the USPS has done here by banning all firearms; however, governments may have some leeway to regulate how a person exercises the right to carry. For example, the Second Amendment might tolerate a ban on concealed carry, so long as the right to carry openly was not denied. *See In re Brickey*, 70 P. at 609 ("The legislature may, as expressly provided in our state constitution, regulate the exercise of this right [to carry], but may not prohibit it."); *Nunn*, 1 Ga. at 251 (holding concealed weapons ban valid because it did not impair the right to

bear arms "altogether"); *Reid*, 1 Ala. at 616–17 (observing that a regulation that amounts to a total ban would be "clearly unconstitutional"). Logically, the inverse is also true; i.e., a government might ban open carry, so long as concealed carry were allowed. *See* James Bishop, Note, *Hidden or on the Hip: The Right(s) to Carry After* Heller, 97 CORNELL L. REV. 907, 920 (2012) ("If concealed carry and open carry are in fact equal alternative outlets for the same indivisible right, then a state can ban or burden one so long as it allows the other."). What government *may not do* is what the USPS has done here: imposing an untailored regulation that prohibits the bearing of arms altogether.[6]

The USPS does not address the long historical tradition of the right to carry. Instead, it relies on inapposite cases, *English v. State*, 35 Tex. 473 (1871), and *Hill v. State*, 53 Ga. 472, 480 (1874), for the proposition that "State courts have . . . readily upheld prohibitions on firearms in a wide variety of public and private settings." Br. for Appellants at 19. These cases did no such thing and their reasoning—that the right to bear arms is defined by reference to the militia—is

---

[6] The 19th-century cases approving concealed carry restrictions reflect a cultural preference for "open, manly, and chivalrous" carrying of arms. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1523 (2009). Those cultural mores have shifted; "[t]oday, open carrying is uncommon, and many law-abiding people naturally prefer to carry concealed (in the many states where it is legal)." *Id*. The constitutional principle remains the same: total bans on carry are unconstitutional.

inconsistent with *Heller*'s conclusion that the Second Amendment protects "an individual right unconnected with militia service." 554 U.S. at 583.

As the Second Circuit ably pointed out, these cases focus on the militia purposes of the Second Amendment; this approach is directly contrary to the Supreme Court's holding in *Heller*:

> These cases were decided on the basis of an interpretation of the Second Amendment—that pistols and similar weapons are not "arms" within the meaning of the Second Amendment or its state constitutional analogue—that conflicts with the Supreme Court's present reading of the Amendment. *Fife*, 1876 WL 1562, at *4; *English*, 1872 WL 7422, at *3; *Andrews*, 1871 WL 3579, at *11. For instance, the Texas court [in *English*] construed the Second Amendment as protecting only the "arms of a militiaman or soldier," which include "the musket and bayonet . . . holster pistols and carbine . . . [and] side arms." 1872 WL 7422, at *3. To refer to the non-military style pistols covered by the statute as necessary for a "well-regulated militia" was, according to the court, "simply ridiculous." *Id*. Similarly, the Tennessee court invalidated the statute to the extent it covered revolvers "adapted to the usual equipment of a soldier." *Andrews*, 1871 WL 3579, at *11.

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 91 n.14 (2d Cir. 2012) (omission in original).[7]

---

[7] Amicus Brady Center attempts to rehabilitate *English* by pointing out that it was cited in *Heller*, but amicus brazenly substitutes its own interpretation while ignoring the Court's. Brady Amicus Br. at 9. *Heller* cited *English* in discussing "that the sorts of weapons protected [by the Second Amendment] were those 'in common use at the time,'" but not "'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939) and 4 Blackstone 148–149 (1769)). Amicus reads this passage as having something to do with "prohibitions on the public carrying of handguns," but *Heller* makes no such reference. Brady Amicus Br. at 9. There is no way to read *Heller* as

*Hill* is a case dealing with carrying a pistol in "a court of justice"; factually,

it has no relevance to this case. 53 Ga. at 473. Doctrinally, it is of a piece with

*English*, although even more resolute in its determination that *any* regulation of the

right to keep and bear arms would be sustained, so long as it did not conflict with

the training of the militia:

> Skill and familiarity in the use of arms was the thing sought for. The
> right to "tote" them, as our colored people say, would be a bootless
> privilege, fitting one, perhaps, for playing soldier upon a drill ground,
> but offering no aid in that knowledge which makes an effective, to-
> wit: a shooting soldier.

*Hill*, 53 Ga. at 480. This is directly contrary to *Heller*'s conclusion that "self-

defense . . . was the central component" of the Second Amendment.[8] 554 U.S. at

599.

*English* suffers from another problem, which the USPS and its amicus seem

blind to: it never had any precedential value in Texas. *English* was decided by the

reconstruction court, a product of military occupation after the Civil War. James R.

Norvell, *Oran M. Roberts and the Semicolon Court*, 37 TEX. L. REV. 279, 288-89

---

concluding that handguns are "dangerous and unusual weapons," since *Heller*'s
holding is that a handgun ban is unconstitutional. 554 U.S. at 628–29.

[8] *Hill*'s anachronistic and offensive reference to "our colored people" hints at the
racists justification for much of the 19th-century gun control that the USPS and its
amicus look to for support. *See Heller*, 554 U.S. at 614–16; Clayton E. Cramer,
*The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17, 17–25 (1995).
These sordid origins are another reason—beyond their incompatibility with
*Heller*—to distinguish these precedents.

(1959). The reconstruction court's opinions were never cited by members of the Texas bar. *Id.* The Texas Court of Appeals earned a stern rebuke for citing *English* because it was decided by "the semicolon court, a court established by a State constitution (that of 1869) which was the product of military occupation and the disfranchisement of most of the State's inhabitants . . . ." *Masters v. State*, 653 S.W.2d 944, 947 (Tex. App.—Austin 1983, no writ) (Powers, J., concurring). The Court of Criminal Appeals deleted the reference to *English* in its opinion affirming the court below. *Masters v. State*, 685 S.W.2d 654 (Tex. Crim. App. 1985).

This is why the Texas Court of Appeals could remark, 16 years after *English*, that "there is no doubt" a person has the right to carry a gun to the local post office while picking up his mail:

> [D]efendant had started to and *was on his way to the Elwood post-office; that he was going for his mail* . . . . True, he had a *double-barrelled gun with him; but this he had a right to carry*, and, if he was carrying it on account of threats deceased had made against his life, this did not lessen, but only emphasized, the right. . . . With the testimony as disclosed in the record before us, *there is no doubt as to his purpose and intention, or that it was a lawful one*.

*Lynch v. State*, 6 S.W. 190, 191–92 (Tex. Ct. App. 1887) (emphasis added).

The weight of history contradicts the idea that "State courts have . . . readily upheld prohibitions on firearms in a wide variety of public and private settings." Br. for Appellants at 19. The right to carry has long been protected by the States,

and the notion that history supports the USPS ban is contradicted by the numerous cases striking down carry bans, even as applied to government property.

## C. Numerous Federal Courts Have Recognized The Right To Carry.

This Court's decision in *Peterson v. Martinez*, 707 F.3d 1197, 1211 (10th Cir. 2013), follows the traditional view that governments have discretion to allow concealed carry, open carry, or both. What the Second Amendment prohibits is what the USPS has done—disallowing both open and concealed carry. Thus, the USPS is correct that *Peterson* "echoes the Supreme Court's recognition in *Heller*," Br. for Appellants at 17, that courts since the 19th century have tolerated concealed carry bans only so long as open carry is allowed. *Heller*, 554 U.S. at 629; *see* Bishop, 97 CORNELL L. REV. at 920.

Unlike the instant case, this Court emphasized that *Peterson* did not involve a total ban on carrying firearms:

> Our task is complicated, however, by the somewhat unusual posture of Peterson's claim. Peterson argues that strict scrutiny is appropriate because he is "completely disarmed" while in Denver. That alleged complete disarmament results from the confluence of two enactments: the state statute that requires CHL [concealed handgun license] applicants to be legal residents of Colorado, Colo. Rev. Stat. § 18–12–203, and the Denver ordinance that requires a CHL for most forms of open carry, Denver Rev. Mun. Code § 38–117(a), (b), & (f).
>
> Peterson has repeatedly expressed, however, that he is not challenging the Denver ordinance.

*     *     *

Accordingly, we must conduct our two-step Second Amendment analysis based on the effects of the state statute rather than the combined effects of the statute and the ordinance. . . . Peterson seeks a ruling that Colorado may not restrict CHLs to residents of the state.  If he succeeds in this challenge, he would be free to obtain a CHL and carry a concealed weapon throughout the state.  *By contrast, had Peterson challenged the Denver ordinance, he may have obtained a ruling that allows him to carry a firearm openly while maintaining the state's restrictions on concealed carry.  The specific constitutional challenge thus delineates the proper form of relief and clarifies the particular Second Amendment restriction that is before us*.

*Id*. at 1208–09 (emphasis added).

Unlike Peterson, Bonidy does not "assert a Second Amendment right to carry a concealed weapon"; he asserts a right to carry, either open or concealed. *Peterson*, 707 F.3d at 1211.  His preferred method of carry is concealed, but if the USPS allowed open carry rather than concealed carry for some justifiable reason, Bonidy's claims would be satisfied.  Likewise, if the USPS banned open carry but allowed concealed carry, Bonidy's Second Amendment right to carry would be vindicated.  The issue in *Peterson* was whether the Second Amendment protects non-residents' right to carry concealed; the issue here is whether the Second Amendment protects the right to carry at all.  Text and history plainly show that it does.  Just as plainly as they show that governments may ban one or the other, but not both.  *Peterson* is consistent with that conclusion.  Thus the district court erred when it read *Peterson* as requiring all right-to-carry claims to be analyzed as open carry claims.  Mem. Op. and Order at 4–5 (Aplt. App. at A918–19).  The

government has historically had flexibility to allow either open or concealed carry, but not the flexibility to ban both.

Most courts that have considered the right to carry post-*Heller*, like *Peterson*, have addressed regulations of the right that fall far short of the total ban imposed by the USPS. *Drake*, 724 F.3d at 440 ("This measured approach neither bans public handgun carrying nor allows public carrying by all firearm owners; instead, the New Jersey Legislature left room for public carrying by those citizens who can demonstrate a "justifiable need" to do so."); *Kachalsky*, 701 F.3d at 98 ("Here, instead of forbidding anyone from carrying a handgun in public, New York took a more moderate approach to fulfilling its important objective . . . ."); *Woollard v. Gallagher*, 712 F.3d 865, 881 (4th Cir. 2013); ("good-and-substantial-reason requirement" for carry permit "constitutes 'a more moderate approach' to protecting public safety and preventing crime than a wholesale ban on the public carrying of handguns.") (quoting *Kachalsky*).[9] Because the regulations in those

---

[9] Many courts that have upheld regulations that fall short of a ban have acknowledged that the Second Amendment protects the right to carry. *Kachalsky*, 701 F.3d at 89; *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., writing separately as to Part III.B); *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011), *aff'd*, 687 F.3d 1244 (11th Cir. 2012); *Peruta v. San Diego*, 758 F. Supp. 2d 1106, 1114 (S.D. Cal. 2010), *appeal docketed*, No. 10-56971 (Dec. 14, 2010). Others have avoided the question. *Woollard v. Gallagher*, 712 F.3d 865, 868 (4th Cir. 2013) ("[W]e reverse the judgment without needlessly demarcating the reach of the Second Amendment."); *Drake*, 724 F.3d at 440.

cases placed limits on the right to carry, but did not nullify the right, they were upheld.

Those courts that have addressed total carry bans have struck them down. *Moore*, 702 F.3d at 942; *Bateman v. Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012). This case addresses the second kind of restriction on the right to carry—a government banning both concealed and open carry.

In *Moore*, the Seventh Circuit echoed the Supreme Court's conclusion that the Second Amendment protects the right to carry: "To speak of 'bearing' arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home." *Id.* at 936. This conclusion was based on a detailed reading of both *Heller* and *McDonald*, leading the Seventh Circuit to describe the right to carry as part of the Second Amendment's core protections: "To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Id.* at 937. Indeed, the Seventh Circuit observed that Second Amendment rights are particularly important outside the home:

> A woman who is being stalked . . . is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building . . . has a claim to sleep with a loaded gun under her mattress.

*Id.* After conducting an exhaustive review of the relevant scientific evidence, the

Seventh Circuit struck down the Illinois ban on both concealed and open carry

because "the empirical literature on the effects of allowing the carriage of guns in

public fails to establish a pragmatic defense of the Illinois law." *Moore*, 702 F.3d

at 939.[10]

The Fourth Circuit's decision in *Masciandaro*, 638 F.3d at 468, is consistent

with the longstanding recognition of the right to carry and suggests certain limits

on the government's authority to regulate the right—limits that the USPS ban fails

to incorporate. *Masciandaro* addressed a National Park Service regulation, 36

C.F.R. § 2.4(b), that "prohibited [national park patrons] from possessing loaded

firearms, and only then within their motor vehicles." 638 F.3d at 473. The Fourth

Circuit upheld 36 C.F.R. § 2.4(b) based on two factors absent in this case: (1) the

regulation allowed possession of firearms for self-defense; and (2) the presence of

armed Park Service Police in the relevant area.[11] *Id*. at 473–74.

Appling intermediate scrutiny, the Fourth Circuit held that the narrow

regulation left "largely intact the right to 'possess and carry weapons in case of

---

[10] The Seventh Circuit assumed that a law banning carry "merely in particular
places, such as public schools," would still require the government to present
evidence to justify such a ban. *Moore*, 702 F.3d at 940.

[11] Congress repealed the regulation shortly after Masciandaro's conviction. Credit
Card Act of 2009, § 512, 16 U.S.C. § 1a-7b (2009) (applying state gun laws to
National Park and National Wildlife Refuge lands).

confrontation.'"  638 F.3d at 474 (quoting *Heller*, 554 U.S. at 592).  This was so because the only firearms affected were those that were loaded, concealed, and within a vehicle.  *Id*.  Any other possession of a firearm was allowed.  *Id*.  The USPS ban is not nearly so narrow as 36 C.F.R. § 2.4(b), because it prohibits Bonidy from carrying any firearm, loaded or unloaded, with no exceptions.

The Fourth Circuit also concluded that "because the United States Park Police patrol Daingerfield Island, the Secretary could conclude that the need for armed self-defense is less acute there than in the context of one's home." *Masciandaro*, 638 F.3d at 474.  No such security or police presence is found at the Avon Post Office, and the need for armed self-defense remains as acute at the Avon Post Office as at any other unsecured property open to the public 24 hours a day, seven days a week.  Mem. Op. and Order at 2–3 (Aplt. App. at A916–17).  Applying the Fourth Circuit's reasoning in *Masciandaro* to this case, the USPS ban should be struck down.

As several federal courts have recognized, it is difficult to read *Heller* and *McDonald* and conclude that the Second Amendment has no application outside the home.  *See, e.g., Kachalsky*, 701 F.3d at 89 ("[T]he Court's analysis suggests[ ] . . . that the Amendment must have some application in the very different context of the public possession of firearms.  Our analysis proceeds on this assumption." (footnote omitted)).  This Court has suggested that it agrees with that view.

*Peterson*, 707 F.3d at 1208–09 ("[Had Peterson challenged the Denver ordinance, he may have obtained a ruling that allows him to carry a firearm openly while maintaining the state's restrictions on concealed carry."). This is a sound assessment, because it is the only view that is consistent with the text, history, and tradition of the Second Amendment. The district court correctly recognized that core conduct protected by the Second Amendment is infringed by the USPS firearms ban because it is a broad prohibition on the carrying of firearms "in case of confrontation." *Heller*, 554 U.S. at 629. Accordingly, the USPS must justify its firearms ban by reference to the "standards of scrutiny that we have applied to enumerated constitutional rights."[12] *Id.* at 628.

---

[12] As the district court recognized, Mem. Op. and Order at 6–7 (Aplt. App. at A920–21), the USPS's reliance on *United States v. Dorosan*, 350 Fed. Appx. 874 (5th Cir. 2009), is misplaced. Br. for Appellants at 22. That case dealt with a restricted-access parking lot that "the Postal Service used . . . for loading mail and staging its mail trucks," not a parking lot open to the public. *Dorosan*, 350 Fed. Appx. at 875. The same goes for the USPS's reliance on *Adderley v. Florida*, 385 U.S. 39, 41 (1966), where the property at issue was "the jail grounds [and] a driveway used only for jail purposes . . . ." Br. for Appellants at 22. Moreover, as an unpublished decision, *Dorosan* is of no precedential value, even in the Fifth Circuit. *See* 5TH CIR. R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996, are not precedent . . . .").

**III.  UNDER STRICT OR INTERMEDIATE SCRUTINY, THE USPS FAILED TO MEET ITS EVIDENTIARY BURDEN.**

This Court has acknowledged that it is required to apply at least intermediate scrutiny:

> [T]here is little doubt that the challenged law imposes a burden on conduct, i.e., Reese's possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment.  Thus, we must apply some level of heightened scrutiny and, in doing so, must look to analogous cases for guidance on precisely what level to apply."

*Reese*, 627 F.3d at 801.  This is consistent with the weight of authority from other courts.  *See Heller v. District of Columbia*, 670 F.3d 1244, 1256 (D.C. Cir. 2011) ("*Heller* clearly does reject any kind of "rational basis" or reasonableness test, but it leaves open the question what level of scrutiny we are to apply to laws regulating firearms.") (citation omitted); *Masciandaro*, 638 F.3d at 474 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) and *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)); *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *United States v. Skoien*, 614 F.3d 638, 638 (7th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010); *GeorgiaCarry.Org*, 764 F. Supp. 2d at 1319; *Peterson*, 707 F.3d at 1216 (Lucero, J., concurring) ("I would apply intermediate scrutiny to both claims to the extent concealed carry is protected . . . ."); *but see Ezell*, 651 F.3d at 708 ("All this suggests that a more rigorous showing than that

applied in *Skoien* should be required, if not quite 'strict scrutiny.'").  Under strict

or intermediate scrutiny, the burden is on the USPS to demonstrate the

constitutionality of its ban.  *Reese*, 627 F.3d at 802.

The district court concluded correctly that the USPS failed to meet its

burden to prove the constitutionality of the Avon Post Office parking lot firearms

ban.  The district court erred, however, by shifting the burden to Bonidy to prove

the firearms ban unconstitutional as applied to the Post Office lobby.  Mem. Op.

and Order at 5 (Aplt. App. at A919).  The USPS should have been required to carry

its burden under at least intermediate scrutiny.  Although strict scrutiny would be

appropriate in this case, under strict or intermediate scrutiny the USPS failed to

meet its evidentiary burden to prove the constitutionality of both the parking lot

and the lobby firearms bans.

### A.  Heightened Scrutiny Applies To Both The Parking Lot And Lobby Firearms Ban.

The district court held correctly that both the parking lot and the lobby

firearms bans burden Second Amendment rights.  Mem. Op. and Order at 5 (Aplt.

App. at A919).  The district court made two reversible errors, however, regarding

the lobby ban:  (1) it concluded that the public lobby of the Avon Post Office—

open to the public 24/7—is a sensitive place; and (2) the district court therefore

relieved the USPS of its burden to prove that the lobby ban does not violate the

Constitution.  *Id*.  The district court should have applied heightened scrutiny to both the parking lot and the lobby firearms bans.

**1.      The lobby of the Avon Post Office is not a sensitive place.**

There is no basis to conclude that the lobby of the Avon Post Office is a sensitive place.  The USPS argues that the Second Amendment should be nullified on all postal property, because all government property is "sensitive."  Br. for Appellants at 23–25.  The district court took a slightly more nuanced view, holding that a "building [] used for a governmental purpose by significant numbers of people, with no means of securing their safety . . . is a sensitive place"  Mem. Op. and Order at 5 (Aplt. App. at A919).

By looking to factors other than government ownership or government use, other courts that have assessed firearms regulations on government property have based the sensitive places assessment on the character of property.  For example, courts have noted that the justification for regulating firearms on school property is the predominate presence of children.  *Hall v. Garcia*, 2011 WL 995933, *4 (N.D. Cal. Mar. 17, 2011) (noting "the presence of large numbers of children" at or near schools); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 367 (Va. 2011) ("Approximately 50,000 elementary and high school students attend summer camps at the University. . . . [B]oth the libraries and the Johnson Center . . . are regularly frequented by children ages two to five years old."); *see*

*also Warden v. Nickels*, 697 F. Supp. 2d 1221, 1230 (W.D. Wash. 2010) ("The Park Rule's findings cite the fact that in 2008 over 108,000 children and youth visited city-owned wading pools and over 59,000 youth events were scheduled at sports fields.").[13]  Conversely, children do not congregate in the Avon Post Office lobby or the adjacent public parking lot.

Labeling the Avon Post Office lobby a sensitive place ignores the careful reasoning of these decisions and instead suggests a blanket rule that would prevent the Constitution from having full effect outside the home, essentially "divorc[ing] the Second Amendment from the right of self-defense described in *Heller* and *McDonald*."  *Moore*, 702 F.3d at 937.  Accordingly, the district court's conclusion that the Avon Post Office lobby is a "sensitive place" outside the protection of the Constitution because postal property is owned by the government and used for government functions finds no support in the case law.

Nor is the lack of security at the Avon Post Office a reason to conclude that its lobby is a sensitive place.  Mem. Op. and Order at 5 (Aplt. App. at A919).  On the contrary, the lack of security demonstrates that the Avon Post office is not sensitive.  Unlike genuinely sensitive places, e.g., *United States v. Davis*, 304 Fed.

---

[13] Moreover, those cases have noted that the regulations do not impose a total ban on possession of firearms, but are instead "narrowly tailored . . . to include only those [areas] where children and youth predominantly recreate," *Warden*, 697 F. Supp. 2d at 1227, and include exceptions for licensed concealed carry and/or possession of a firearm in a vehicle.  *Hall*, 2011 WL 995933, at *1; *DiGiacinto*, 704 S.E.2d at 370.

Appx. 473 (9th Cir. 2008) (airplanes), there is no security or law enforcement presence at the Avon Post Office. Pls.' Cross-Mot. ¶¶ 12–19 (Aplt. App. at A619–20). Even though the USPS firearms ban deprives individuals of the means of self-defense, no security or law enforcement officers are regularly employed at the Avon Post Office to protect the personal security of postal patrons. *Id*. ¶¶ 14–16 (Aplt. App. at A619). Nor do security personnel electronically screen persons entering the Avon Post Office to determine whether persons are carrying weapons. *Id*. ¶ 12 (Aplt. App. at A619). Security personnel do not restrict access to the Avon Post Office to only those persons who have been screened and determined to be unarmed. *Id*. ¶ 13 (Aplt. App. at A619). No packages are screened to determine if they contain weapons. *Id*. ¶ 18 (Aplt. App. at A620). Even public schools provide a greater level of security than the Avon Post Office, by restricting the general public's access to school buildings.[14] *See, e.g.,* C.R.S. § 18-9-112; Denver Public Schools Policy KI, Visitors to Schools, *available at* http://tinyurl.com/68h9rx3. Indeed, the public is free to come and go as they please, 24 hours a day, seven days a week in the lobby area of the Avon Post

---

[14] The USPS conceded below that Post Offices are "generally open to the public," Docket No. 34, Defs.' Opp'n at 19–20 n.9 (Aplt. App. at A745–46), but attempted to downplay the stark differences between public schools and the Avon Post Office. However, as the USPS conceded, the public is not free to come and go as they please, 24 hours a day, from public schools. *Id*. Conversely, access to the lobby of the Avon Post Office is unconstrained. Pls.' Cross-Mot. ¶ 10 (Aplt. App. at A619). The postal parking lot adjacent to the Avon Post Office is similarly unsecured and open to the public. *Id*. ¶¶ 8, 21.

Office.  Pls.' Cross-Mot. ¶ 10 (Aplt. App. at A619).  The adjacent public parking lot is similarly unsecured and open to the public.  *Id*. ¶¶ 8, 21 (Aplt. App. at A619–20).

That courts have declined to label all government property exempt from the Second Amendment is unsurprising.  If the mere fact of government ownership could make property sensitive, huge swaths of the United States would become Second Amendment-free zones, including public roads, sidewalks, parking lots, and vast stretches of public lands managed by state and federal governments.  This is inconsistent with the historically recognized right to carry.  *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 162–63 (2007) (noting that 18th Century laws in Pennsylvania and New Jersey banned gunfire on or near highways, but "explicitly protected the carrying of guns on the highways."); *see also, e.g., Pillow*, 501 P.2d at 745 ("possess[ing] a firearm in a vehicle or in a place of business for the purpose of self-defense. . . . are constitutionally protected."); *accord State v. Blocker*, 630 P.2d 824, 826 (Or. 1981); *Moberg*, 485 P.2d. at 738; *In re Brickey*, 70 P. at 609.

It is easy enough to assert that a place is sensitive.  But the USPS must be required to *prove* that the Avon Post Office lobby is sensitive, based on the objective character of the lobby and precautions the USPS has actually taken to

ensure the safety of its patrons.  Unless the Second Amendment is subject to

cancellation by bureaucratic whim, the evidence that could justify a total carry ban

would necessarily focus on actions already being taken to ensure security, not *post

hoc* rationalizations about whether a particular facility is sensitive.[15]  *See Abilene

Retail No. 30, Inc. v. Board of Com'rs of Dickinson County*, 492 F.3d 1164, 1173

(10th Cir. 2007) ("[T]he Board must show that . . . it relied on "'evidence that is

reasonably believed to be relevant for demonstrating a connection between speech

and a substantial, independent government interest.'") (quoting *City of Los Angeles

v. Alameda Books*, 535 U.S. 425, 438 (2002)); *see also Burlington Truck Lines,

Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept

appellate counsel's post hoc rationalizations for agency action . . . ."); *Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 50

(1983) ("It is well-established that an agency's action must be upheld, if at all, on

the basis articulated by the agency itself.").  The USPS has taken no active steps to

protect customers of the Avon Post Office from criminals, yet they have denied

law-abiding postal customers the ability to protect themselves.  Accordingly, the

---

[15] All of the justifications the USPS offered for its firearms ban post-date the
codification of the ban at 39 C.F.R. § 232.1(*l*).  *See* Pls.' Cross-Mot., Ex. 4,
Defendants' Objections And Responses To Plaintiffs' First Set Of Requests For
Production Of Documents at 5 (Aplt. App. at A704).  The USPS produced no
findings or studies that were relied on by the Postal Service prior to the
promulgation of 39 C.F.R. § 232.1(*l*).  *Id.*  Nor did it produce any subsequent
studies; instead, the USPS relied on a self-serving declaration by one of its
employees.

district court erred in concluding that the lobby of the Avon Post Office is a "sensitive place." *Heller,* 554 U.S. at 626.

> **2.      Presumptively lawful regulations can still be unconstitutional**.

Even if the lobby of the Avon Post Office were a "sensitive place," that would not relieve the USPS of its burden to prove that the ban meets constitutional muster.  As the Seventh Circuit explained in a case challenging the felon-in-possession prohibition of 18 U.S.C. § 922(g)(1), which the Supreme Court explicitly identified as "presumptively lawful":

> [T]he government does not get a free pass simply because Congress has established a "categorical ban"; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself.  *Heller* referred to felon disarmament bans only as "presumptively lawful," which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.  Therefore, putting the government through its paces in proving the constitutionality of § 922(g)(1) is only proper.

*Williams*, 616 F.3d at 692; *see also Chester*, 628 F.3d at 679 ("In fact, the phrase 'presumptively lawful regulatory measures' suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'") (quoting *Williams*, 616 F.3d at 692).  Indeed, if the *Heller* dicta absolved the USPS of the burden of proving the constitutionality of its firearms ban as applied here, then *Heller* would impose something approximating the rational basis test; that approach was explicitly rejected by *Heller*.  554 U.S. at

628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *see also Chester*, 628 F.3d at 679.

The district court assumed that the presumptively lawful dicta shifted the burden to Bonidy to prove the ban unconstitutional as applied to the Post Office lobby. Mem. Op. and Order at 5 (Aplt. App. at A919). That is inconsistent with the approach taken by other Circuits. As the D.C. and Second Circuits have held, a plaintiff overcomes the presumption of constitutionality "by showing the regulation does have more than a de minimis effect upon [Second Amendment] right[s]. A requirement of newer vintage is not, however, presumed to be valid." *Heller*, 670 F.3d at 1253; *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012); *see also Peterson*, 707 F.3d at 1218 n.1 (Lucero, J., concurring). The burden then shifts back to the government to prove the constitutionality of its ban. *See Williams*, 616 F.3d at 692. Even if the lobby area of the Avon Post Office were a "sensitive place," Bonidy easily overcame any presumption of constitutionality by showing that the ban renders his right to bear arms a nullity anytime he walks into the Avon Post Office to pick up his mail. Mem. Op. and Order at 3 (Aplt. App. at A917) ("[T]he regulations governing Conduct on Postal Property prevent [Bonidy] from carrying firearms, openly or concealed, onto any

real property under the charge and control of the Postal Service."). Accordingly, the USPS should not have gotten a "free pass" with respect to its lobby firearms ban. *Williams*, 616 F.3d at 692. Rather, the USPS should have been required to make a "strong showing" that the ban on both open and concealed carry in the Post Office lobby is constitutional. *Id*. The USPS made no such showing here. Rather, the district court simply assumed that an openly carried firearm "may excite passions" and cause public safety issues. Mem. Op. and Order at 10 (Aplt. App. at A924). Given the district court's misreading of *Peterson*, it did not even consider whether the same issues might appertain to concealed carry. By not holding the USPS to its burden of proof, the district court committed reversible error.

**B.      Strict Scrutiny Is Appropriate, Because The USPS Ban Places A Severe Burden On The Core Second Amendment Right Of Armed Self-Defense.**

Given that heightened scrutiny is appropriate, the question remains whether strict or intermediate scrutiny should apply. Strict scrutiny would be appropriate here, because the USPS firearms ban effects a broad prohibition on law-abiding citizens' right to keep and bear arms for self-defense. Because the ban extends to firearms stored in vehicles in the Avon Post Office parking lot, the burden on the Second Amendment is not just on postal property, but everywhere a law-abiding

individual travels before and after visiting postal property.[16]  Thus, the USPS ban

prohibits core conduct protected by the Second Amendment:  lawfully carrying a

firearm for self-defense.

It is well established that, "just as in the First Amendment context, the level

of scrutiny in the Second Amendment context should depend on 'the nature of the

conduct being regulated and the degree to which the challenged law burdens the

right.'"  *Chovan*, 735 F.3d at 1138 (quoting *Chester*, 628 F.3d at 682); *Ezell*, 651

F.3d at 708 ("a severe burden on the core Second Amendment right of armed self-

defense will require an extremely strong public-interest justification and a close fit

between the government's means and its end.").  Numerous federal courts have

acknowledged that a ban on law-abiding individuals possessing firearms, "in [the]

home or elsewhere, whether for self-defense or hunting, or any other lawful

purpose" should be subject to rigorous scrutiny.  *Heller*, 670 F.3d at 1257–58;

*Chester*, 628 F.3d at 682 ("In the analogous First Amendment context, the level of

scrutiny we apply depends on the nature of the conduct being regulated and the

---

[16] The USPS suggests that the burden of the parking lot ban on Bonidy is lessened because he can park unlawfully in the private parking lots of nearby businesses, that are reserved for customers of those businesses.  Br. for Appellants at 33–34; Bonidy Dep. at 152 (Aplt. App. at A697).  Bonidy could likewise park unlawfully in the middle of the street or on the sidewalk.  The USPS's argument is a red hearing.  Although the USPS need not provide parking for its patrons, when it does, as it has at the Avon Post Office, its regulatory authority is constrained by the Constitution.  *See Initiative and Referendum Institute*, 417 F.3d at 1306.  That the Postal Service has chosen to open its property to the public does not give it a free pass to avoid Constitutional scrutiny of its regulations.

degree to which the challenged law burdens the right."); *Kachalsky*, 701 F.3d at 93 ("We have held that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes).").

The USPS ban renders "the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense" a nullity on all postal property and when travelling to and from postal property. *Chovan*, 735 F.3d at 1138. Because the USPS ban "implicate[s] the core Second Amendment right, [and] place[s] a substantial burden on the right . . . strict scrutiny is the proper standard to apply." *Id*. Therefore, the USPS must show that its ban is "narrowly tailored to serve a compelling governmental interest" and "is necessary to serve the asserted [compelling] interest." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992).

The USPS concedes that if the Second Amendment has any application on public property, then heightened scrutiny is appropriate. Br. for Appellants at 27. The minimum standard courts have applied to Second Amendment challenges is intermediate scrutiny, but unlike the USPS ban, these intermediate scrutiny cases involve mainly: (1) regulations that apply only to people who "undeniably pose a heightened danger of misusing firearms," *Reese*, 627 F.3d at 802; or (2) regulations that are less burdensome than a complete ban. *See Chovan*, 735 F.3d at 1138

(Because it does not apply to law-abiding citizens, "§ 922(g)(9) does not implicate the core Second Amendment right, but it does place a substantial burden on the right.").  A more narrowly tailored regulation might be subject to intermediate scrutiny—such as a regulation that did not render the interest in personal safety nugatory on all postal property, or that did not burden the ability of law-abiding citizens to carry firearms before and after visiting public property.  But the USPS ban incorporates no such moderating limitations.  Accordingly, the ban must be subject to strict scrutiny.  *See Chovan*, 735 F.3d at 1138; *Ezell*, 651 F.3d at 708.

### C.    Under Either Strict Or Intermediate Scrutiny, The USPS Failed To Draw A Connection Between Crime Prevention And Its Firearms Ban.

Ultimately, like the district court, this Court need not determine what level of heightened scrutiny applies here.  Under intermediate or strict scrutiny, the USPS failed to proffer evidence to justify its draconian ban—either as applied to the lobby of the Avon Post Office or the adjacent public parking lot.

In order to survive even intermediate scrutiny, "'the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective.'"  *Reese*, 627 F.3d at 802 (quoting *Williams*, 616 F.3d at 692).  It is undisputed that crime prevention is an important government objective.  Mem. Op. and Order at 8 (Aplt. App. at A922).

The USPS ban is not sufficiently tailored because "a substantial portion of the burden on [personal security] does not serve to advance its goals." *Ward*, 491 U.S. at 800; *Heller*, 670 F.3d at 1258 ("[T]he District must establish a tight 'fit' between the [firearm] registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'" (quoting *Fox*, 492 U.S. at 480)). The USPS must prove that the broadest possible regulation, a total ban, does not "burden substantially more [conduct] than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 798–800. Bonidy's carrying a firearm in the lobby of the Avon Post Office or in a private vehicle parked in a public parking lot is not "an appropriately targeted evil," *Frisby v. Schultz*, 487 U.S. 474, 485 (1988), it is a constitutionally protected fundamental right. The USPS ban is not narrowly tailored, because it targets all guns on all postal property indiscriminately.

The USPS's argument is that it is necessary to prohibit all firearms in order to prevent unlawful use of firearms. Br. for Appellants at 28–30. The USPS perceives this argument as "beyond dispute" and "common-sense," *id*. at 28, but it is the same argument rejected in *Heller* and *McDonald*, where the District of Columbia and the City of Chicago, respectively, argued that it was necessary to ban all handguns in those cities in order to prevent crime. *McDonald,* 130 S. Ct. at

3056–57 (Scalia, J., concurring); *Heller*, 554 U.S. at 636. The district court correctly rejected this argument as "conclusory" and disconnected from the characteristics of the property at issue in this case. Mem. Op. and Order at 8 (Aplt. App. at A922).

The declaration on which the USPS relies to "bolster" its argument only piles generalization and speculation atop bald assertion. The declaration states that "criminals frequently target" postal property, including customers who are victimized in parking lots.[17] Br. for Appellants at 29 (quoting Milke Decl. ¶ 16 (Aplt. App. A89)). The USPS also worries that criminals might retrieve a gun from their own car or someone else's. *Id.* The USPS's logic turns the Second Amendment on its head, by justifying a prohibition on the right to effective self-defense at a particular location simply because the need is greater. That crime occurs in a particular area tends to increase, not decrease, the need for effective self-defense in that area. *See McDonald*, 130 S. Ct. at 3049 (noting the importance of the Second Amendment in "high-crime areas."). Statistical evidence of crime could justify narrowly tailored carry restrictions focused on prohibiting criminal use of firearms, such as 18 U.S.C. §§ 930[18] or 922(g)[19], but would do nothing to

---

[17] As the district court noted, these incidents have not occurred at the Avon Post Office. Mem. Op. and Order at 7 (Aplt. App. at A912).

[18] Prohibiting possession of firearms in Federal facilities, except "the lawful carrying of firearms . . . incident to hunting or other lawful purposes." 18 U.S.C. § 930(d)(3).

justify an outright ban that swept legitimate self-defense within its reach. This is especially true at the Avon Post Office, because the USPS provides no security guards or any other similar measures to protect the interest in personal safety that is at the core of the Second Amendment. By choosing not to provide security to protect postal patrons, the USPS increases the need for effective self-defense and diminishes any possible justification for its firearms ban. There is no "tight fit" between banning all guns at the Avon Post Office and preventing crime. *Heller*, 670 F.3d at 1258; *McDonald,* 130 S. Ct. at 3056–57 (Scalia, J., concurring); *Heller*, 554 U.S. at 636.

The USPS's other justification for a total ban is that, without a blanket ban, "'there would be no authority to apprehend' individuals seen entering [postal] property with a firearm." Br. for Appellants at 30 (quoting Milke Decl. ¶ 46 (Aplt. App. A98)). As the Seventh Circuit noted in *Moore*, preventing all carrying of firearms in order to catch criminals who are carrying "is a weak argument. . . . Often the officer will have no suspicion (the gun is concealed, after all)." 702 F.3d at 938. And, even if concealed carry is banned, "[m]any criminals would continue to conceal the guns they carried, . . . so the police would have the same opportunities (limited as they are, if the concealment is effective and the concealer does not behave suspiciously) that they do today to take concealed guns off the

---

[19] Prohibiting possession of firearms by people who "undeniably pose a heightened danger of misusing firearms." *Reese*, 627 F.3d at 802.

street." *Id*.

For all its handwringing about public safety, the USPS never acknowledges the total lack of security at the Avon Post Office. Even if any of the asserted concerns about enforcement authority and preventing crime could justify a firearms ban, the USPS never explains how any of those concerns are relevant to this case. There is no postal police force to apprehend individuals seen entering postal property with a firearm or protect postal patrons from criminals robbing them of their mail at the Avon Post Office. Self-defense is the last and only line of defense.

The USPS also ignores the fact that nationwide, in the past five years, in all but three "incidents involving the unlawful possession of firearms or other dangerous and deadly weapons while on Postal Service property [the suspect] was arrested and/or charged pursuant to another provision of law, or . . . arrest and/or charge did not result." Pls.' Cross-Mot., Ex. 5, Defendants' Objections And Responses To Plaintiffs' First Set Of Interrogatories at 5–6 (Aplt. App. at A713–14). Thus, it has generally proved unnecessary for postal employees to ferret out criminals possessing firearms on postal property because the criminals identify themselves by committing other crimes.

No court has relied on the sort of bald assertions the USPS presents to justify a firearms ban. Rather, courts have looked to empirical evidence to assess the

constitutionality of firearms regulations. *See Chovan*, 735 F.3d at 1140 (requiring statistical evidence for disarming domestic violence misdemeanants); *Skoien*, 614 F.3d at 643 (same); *Woollard*, 712 F.3d at 877 ("The General Assembly's findings are buttressed by more recent evidence proffered by the State in these proceedings."); *Heller*, 670 F.3d at 1259 ("Therefore, the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments."). This is the same sort of evidence the Supreme Court has required in the First Amendment context. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (The court's role "is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.").

The Seventh Circuit has concluded that statistics show a clear lack of evidence to support any connection between the government's interest in public safety and disarming law-abiding individuals. *Moore*, 702 F.3d at 939. As the Seventh Circuit noted after conducting an exhaustive review of the relevant scientific evidence:

> In sum, the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law [banning concealed and open carry]. . . . If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.

*Id*. The Seventh Circuit's observations apply with equal force here. The fact is, a

gun is more likely to be used for self-defense than in the commission of a crime.
Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The Prevalence and
Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 167
(1995).  This is especially true in the context of licensed carry.  *See* Volokh, 56
UCLA L. REV. at 1520 n.323 (citing National Academy of Sciences and Centers
for Disease Control reports showing no net increase in crime associated with
licensed concealed carry); Philip J. Cook, et al., *Gun Control After Heller: Threats
and Sideshows From a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1082
(2009) ("Based on available empirical data, therefore, we expect relatively little
public safety impact if courts invalidate laws that prohibit gun carrying outside the
home . . . ."); David Kopel, *Pretend "Gun-free" School Zones: A Deadly Legal
Fiction*, 42 CONN. L. REV. 515, 564–69 (2009) (examining the extraordinarily low
crime rates for concealed carry licensees across several States).

Under the USPS's reasoning, any law meant to limit firearm possession with
the intent of reducing crime would be constitutional.  The USPS treats firearm
carrying as an inherent social harm, but that is inconsistent with empirical studies
and, more important, the constitutional guarantee of an individual right to keep and
bear arms.  Protecting the right to carry in the Constitution requires the USPS to
regulate with some degree of nuance; but the Constitution requires the USPS to
conform to its standards, not the other way around.  The assertion of the crime

prevention interest is not an excuse to override the constitutional requirement that the regulation be tailored to that interest. The district court recognized that the Constitution requires a substantial fit between the government interest and the chosen means of accomplishing that interest. Mem. Op. and Order at 8 (Aplt. App. at A922). A broadscale ban that makes no "accommodations that may lessen the burden on Bonidy's individual interest in self-protection" is not appropriately tailored. *Id.*; *Ward*, 491 U.S. at 800. The district court's error, as shown above, was in failing to apply that standard to both the parking lot and the lobby firearms bans.

The Second Amendment does not prevent the USPS from regulating firearm possession on postal property, "but the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. One of the choices removed is "a broadscale prohibition against" lawful possession of a firearm for self-defense, especially where the government provides no security to protect the interest in personal safety that is at the core of the Second Amendment. *Initiative and Referendum Institute*, 417 F.3d at 1315. Just as the First Amendment protects the freedom of speech in order to protect the strong public interest in "the free flow of ideas," *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988), the Second Amendment protects the right to keep and bear arms in order to protect the strong public interest in personal safety, *McDonald*, 130 S. Ct.

at 3040.

The Postal Service may still enforce generally applicable rules, but unlike mailboxes, its Post Offices fall into qualitatively different categories. *Cf. Rockville Reminder v. U.S. Postal Service*, 480 F.2d 4, 7 (2d Cir. 1973); Br. for Appellants at 32. A Post Office that is inside a sterile area, such as an airport, the United States Capitol, or a Federal courthouse, would obviously have an easy time justifying a ban on firearms because the interest in personal security is honored by screening all individuals and providing a substantial law enforcement presence. Similarly, a Post Office that does not screen all patrons, but that regularly provides armed security, might face a lesser burden. However, a Post Office that provides no security, no screening, and no restrictions on access to its public areas, such as the Avon Post Office, fails to honor the commitment to personal safety enshrined in the Second Amendment; such an application of the USPS firearms ban denies law-abiding postal customers the ability to protect themselves and renders nugatory the interests protected by the Second Amendment. The Constitution will not countenance the USPS's broadscale approach to regulation of Second Amendment rights, no more than it allows a similarly unnuanced approach to the First Amendment.

## CONCLUSION

For the foregoing reasons, the district court's holding that the USPS firearms ban is unconstitutional as applied to Bonidy's use of the parking lot at the Avon Post Office should be affirmed; the judgment of the district court holding that the firearms ban in the lobby of the Avon Post Office is constitutional should be reversed. The case should therefore be remanded for entry of judgment in favor of Bonidy on both claims.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested. This is a case of first impression involving the fundamental constitutional right to keep and bear arms. Because of the complexity of the legal issues involved and the national significance of these issues, oral argument would be beneficial.

DATED this 2nd day of January 2014.

Respectfully submitted,

/s/ James M. Manley
James M. Manley
Steven J. Lechner
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmanley@mountainstateslegal.com

lechner@mountainstateslegal.com

Attorneys for Plaintiffs-Appellees

# CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 28.1(e) and 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 13,025 words. I relied on Microsoft Word to obtain the count. I certify that the information on this page is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.


/s/ James M. Manley
James M. Manley

## CERTIFICATE OF ELECTRONIC FILING

Pursuant to Fed. R. App. P. Rule 25, 10th Cir. R. 25, and the 10th Cir. CM/ECF User Manual, I hereby certify that:

(1)    all required privacy redactions have been made;

(2)    the electronic submission is an exact copy of the hard copies filed with the Clerk;

(3)    the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program, BitDefender Antivirus Pro Plus 2012, updated Jan. 2, 2014, and, according to that program it is free of viruses.


/s/ James M. Manley_____
James M. Manley

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of January 2014, the foregoing document was filed using the appellate ECF system and that all parties of record were served through that system.  Additionally, I certify that seven copies of the foregoing document will be delivered to the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit within two business days.

/s/ James M. Manley
James M. Manley